**UNITED STATES of America**

v.

**Joseph BYRAN, Defendant.**

**Crim. No. 86–00015–B.**

United States District Court,
D. Maine.

Aug. 8, 1986.

---

**1246**

Jay P. McCloskey, Asst. U.S. Atty., Bangor, Me., for U.S.

J. Hillary Billings, Bangor, Me., for defendant.

## MEMORANDUM AND ORDER

CYR, Chief Judge.

Defendant is accused of attempting to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a) & 846. He moves to suppress evidence obtained as a result of a search of his person on October 11, 1985.

### FACTS

On October 11, 1985 Sergeant Michael Harrington of the Penobscot County Sheriff's Department asked Detective-Sergeant Michael Hall of the Brewer Police Department to assist in a warranted search of a residence in Brewer, Maine. Prior to executing the search warrant, Hall was told that the residence to be searched was owned by Adelbert Cassidy, who lived on the premises with Butch Trojano and Cindy Ashe, and that (on the basis of information from a confidential informant) Sergeant Harrington believed that the Cassidy residence was being used for the sale and distribution of cocaine.

Hall and other officers began searching the Cassidy residence shortly before 6:00 p.m. on October 11, 1985. Hall testified that during the search of the residence the telephone rang several times and was answered by the officers. One caller, who identified himself as "Junior," called three times, attempting to purchase cocaine from Trojano. Hall, who was in plain clothes, arranged to meet "Junior" on the pretense of a sale of cocaine. Before Hall left at 6:00 p.m. to meet "Junior," cocaine and drug paraphernalia had been found in the course of the search of the Cassidy residence.

When Hall arrived at the meeting place, a male approached Hall's unmarked car. After the approaching male had responded affirmatively to Hall's inquiry as to whether his name was "Junior," Hall invited him into the car, whereupon "Junior" realized that he was in a police cruiser. Hall gave "Junior" the *Miranda* warnings and asked if he had called the Cassidy residence. After initially denying the call, "Junior" admitted to the call and gave a full statement. "Junior" stated that he had purchased cocaine from Trojano at least five times, most recently four days earlier. Hall took "Junior" to the Brewer Police Department, where his statement was taped but he was not formally arrested.

Hall returned to the Cassidy residence. Trojano and Ashe were at the residence and in custody, having arrived while Hall was meeting with "Junior." On a table Hall observed a rolled-up plastic bag containing a white powder, a money bag, a handgun and drug paraphernalia, items which had been dropped by Ashe when she entered the residence and realized that police officers were conducting a search.

Shortly thereafter, at about 9:00 p.m., Hall saw Sergeant Page of the Brewer Police Department answer the telephone.

Page testified that this call, which was the only call he answered that evening, was from a male who identified himself as "Joe." Joe asked if he (Page) had any "product," and, when Page said "yes," Joe said that he needed "half an ounce." The caller asked where they should meet, to which Page replied "here," meaning the Cassidy residence. Joe said he would call back in ten minutes for directions to the Cassidy residence.

Ten minutes later the phone rang and Detective Hall answered. The male caller asked if this was Butch, and Hall answered "yes." The caller identified himself as "Joe" and said that he needed directions to the house. Hall asked him where he was calling from, and Joe said "Captain Nick's," a local restaurant. Hall gave the caller directions and asked how much cocaine the caller wanted to purchase. Joe said that he wanted to buy half an ounce. Hall indicated that the price would be $1,100.

Approximately ten minutes later defendant arrived at the Cassidy residence. Sergeant Page, who was in uniform, had been instructed to remain outside the residence, out of sight, and to follow behind anyone who approached the house. Defendant knocked on the front door of the residence, and Hall yelled "come in." Defendant entered the residence, with Sergeant Page following him inside. Hall asked the defendant if he was Joe, and defendant said "yes." In response to Hall's questions defendant denied having called the residence but admitted that he had just come from Captain Nick's restaurant.[1] Defendant stated that he was at the residence to see Cindy Ashe about purchasing a refriger-

ator. Hall identified himself as a police officer and told defendant that he had entered premises which were being searched pursuant to a warrant and that therefore defendant too was subject to search. Defendant was instructed to empty his pockets. Among defendant's personal possessions was $1,159 in cash. The cash was counted, retained by the police, and defendant was given a receipt. After a brief discussion with the officers, defendant was released, with the advice that the facts of his case would be presented to a grand jury and that defendant probably would be indicted.

## DISCUSSION

Defendant contends that Detective Hall's request that he empty his pockets gave rise to an illegal personal search, the fruits of which must be suppressed.[2] Defendant argues that the search of his person was not within the scope of the premises warrant and cannot be justified as a search incident to arrest because defendant was not formally arrested. Alternatively, defendant maintains that, if there was an arrest, it was not supported by probable cause.

■ Detective Hall's instruction to defendant to empty his pockets, made after Hall had identified himself as a police officer and after Hall had explained to defendant that he was subject to search, clearly constituted a personal search. It is equally clear, and implicitly conceded by the Government, that the search was not within the scope of the premises warrant. As the First Circuit has stated, "[a] search of clothing currently worn is plainly within the ambit of a personal search and outside

1. The only factual dispute concerns the content of defendant's conversation with Detective Hall prior to the search. It is clear that defendant identified himself as Joe. However, there was some conflict in the accounts given as to whether it was before or after he was searched that the defendant stated that he had come from Captain Nick's. Defendant did not testify, and when defendant's attorney posed this question directly to Detective Hall, he testified that, to the best of his recollection, it was *prior* to the search that defendant had said that he had just come from Captain Nick's, and that he was at

the residence to see Cindy Ashe. The court finds this testimony credible.

2. Defendant also moved to suppress the statements made by him during his detention at the residence, because defendant was not advised of his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This issue is not before the court, however, as the Government has agreed not to use defendant's statements at trial.

the scope of a warrant to search the premises." *United States v. Micheli*, 487 F.2d 429, 431 (1st Cir.1973); *see also United States v. Di Re*, 332 U.S. 581, 587, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *United States v. Branch*, 545 F.2d 177, 181–82 (D.C.Cir. 1976).

Whether the search is permissible as a form of search incident to arrest presents a closer question. In *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Court held that

[a] *custodial arrest* of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. *It is the fact of the lawful arrest which establishes the authority to search,* and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

*Id.* at 235, 94 S.Ct. at 476 (*emphasis added*). Where a detention amounts to less than a custodial arrest, however, the permissible bounds of a personal search are less clear.[3]

In *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), the Court upheld the constitutionality of a search of a defendant who was in police custody but who was not formally arrested.[4] Murphy's wife had been murdered by strangulation. The circumstances of her death led the police to believe that the killer was someone known to the victim. Murphy voluntarily went to the police station to answer questions and in the course of questioning a police officer noted a dark spot on Murphy's finger. The police officer asked per-

mission to take a sample of scrapings from Murphy's fingernails. Murphy refused. Nevertheless, in the face of defendant's protest and without a warrant, the police sampled the scrapings under Murphy's nails and found incriminating evidence. The Ninth Circuit reversed the district court's denial of habeas relief, stating that

Murphy was not under arrest at the time the challenged search was made, and our review of the record convinces us that there were no such exigent circumstances existing at the time of the search which would require that it immediately be conducted without the procurement of a warrant, assuming that such probable cause existed as might have justified the issuance of a warrant.

*Murphy v. Cupp*, 461 F.2d 1006, 1007 (9th Cir.1972), *rev'd* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). Finding the search lawful under the same principles which permit a warrantless search incident to arrest, the Supreme Court reversed. *Id.*

Although Murphy was not formally arrested, the Court noted that the brief detention at the police station was a seizure of the person, implicating fourth amendment rights. 412 U.S. at 294, 93 S.Ct. at 2003. The detention was permissible, however, because there was probable cause to believe that Murphy had committed the murder. *Id.* at 294–95, 93 S.Ct. at 2003. Given probable cause to seize defendant's person, the Court concluded that the search was permissible:

We believe this search was constitutionally permissible under the principles of *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. *Chimel* stands in a long line of cases recognizing an exception to the warrant requirement when a search is incident to a valid ar-

---

**3.** In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court held that police officers may conduct a limited search for weapons where there is a reasonable suspicion that an individual is armed and dangerous. *Id.* at 27, 88 S.Ct. at 1883. The instant search clearly was not a *Terry* search, however, as Detective Hall testified that the search was for evidence, not weapons, and that he did not believe that the defendant posed any threat to safety. *Cf.*

*Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 [*Terry* inapposite absent facts from which officer can infer that individual is armed and dangerous].

**4.** Murphy was formally arrested approximately one month after the questioning at the police station. 412 U.S. at 294, 93 S.Ct. at 2003.

rest. *Id.*, at 755–762, 89 S.Ct. at 2035–2039. The basis for this exception is that when an arrest is made, it is reasonable for a police officer to expect the arrestee to use any weapons he may have and to attempt to destroy any incriminating evidence then in his possession. *Id.*, at 762–763, 89 S.Ct. at 2039–2040. The Court recognized in *Chimel* that the scope of a warrantless search must be commensurate with the rationale that excepts the search from a warrant requirement. Thus, a warrantless search incident to arrest, the Court held in *Chimel*, must be limited to the area "into which an arrestee might reach." *Id.*, at 763, 89 S.Ct. at 2040.

Where there is no formal arrest, as in the case before us, a person might well be less hostile to the police and less likely to take conspicuous, immediate steps to destroy incriminating evidence on his person. Since he knows he is going to be released, he might be likely instead to be concerned with diverting attention away from himself. Accordingly, we do not hold that a full *Chimel* search would have been justified in this case without a formal arrest and without a warrant. But the respondent was not subjected to such a search.

At the time Murphy was being detained at the station house, he was obviously aware of the detectives' suspicions. Though he did not have the full warning

of official suspicion that a formal arrest provides, Murphy was sufficiently apprised of his suspected role in the crime to motivate him to attempt to destroy what evidence he could without attracting further attention. Testimony at trial indicated that after he refused to consent to the taking of fingernail samples, he put his hands behind his back and appeared to rub them together. He then put his hands in his pockets, and a "metallic sound, such as keys or change rattling" was heard. The rationale of *Chimel*, in these circumstances, justified the police in subjecting him to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails, cf. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.

412 U.S. at 295–96, 93 S.Ct. at 2003–04 [footnote omitted]. Thus the Court concluded that the search did not violate the fourth amendment, considering (1) the existence of probable cause, (2) the limited intrusion attending the detention and search at the police station, and (3) the destructibility of the evidence. *Id.* at 296, 93 S.Ct. at 2004.

 The court finds the instant case indistinguishable from *Cupp* in all material respects.[5] First, defendant was subjected to a brief detention shortly after he entered the Cassidy residence and identified him-

**5.** Although not expressly stated, defendant's supplemental memorandum implies that, in determining whether the challenged search was constitutional, the court should attach some significance to the fact that Detective Hall searched defendant under the erroneous subjective belief that the personal search was within the scope of the premises warrant. It is clear, however, for fourth amendment purposes, that the court is to look to the objective facts, rather than the subjective state of mind of the officer, to determine the constitutionality of the search. As the Supreme Court noted in *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Id.* at 138, 98 S.Ct. at 1723; *see also United States v. Morales*, 737 F.2d 761,

765 (8th Cir.1984) [existence of exigent circumstances must be determined based on objective facts known to officer, rather than officer's subjective state of mind]; *United States v. Arra*, 630 F.2d 836, 845 n. 12 (1st Cir.1980) [motivation for a particular search is not relevant where there is an objective basis for the search]. Thus, notwithstanding Detective Hall's clearly mistaken understanding of the legal basis for his actions at the time that he searched defendant's person, the court considers the legality of the search in light of the objective facts known at the time of the search. Defendant has not identified, nor can the court discern, any way in which the values and protections inherent in the fourth amendment are furthered by suppressing evidence merely because the searching officer has mistakenly formulated the precise legal theory justifying the search. *See generally* 1 W.R. LaFave, *Search and Seizure* § 3.2(b) (Supp. 1986).

self. The detention was lawful because the police had probable cause to arrest defendant for attempting to possess cocaine once the defendant had identified himself and once he had said that he had just come from Captain Nick's.

"Probable cause to arrest means evidence that would warrant a prudent and reasonable man ... in believing that a particular person has committed or is committing a crime." *Sibron v. New York*, 392 U.S. 40, 75, 88 S.Ct. 1889, 1908, 20 L.Ed.2d 917 (1968) (Harlan, J., concurring in result) [footnote omitted]. Almost immediately after defendant entered the Cassidy residence, and prior to the search, Detective Hall was aware of the following facts: (1) cocaine, and other indicia of cocaine trafficking, such as scales, a handgun, large amounts of cash, notebooks, mirrors, and razor blades, were found at the Cassidy residence; (2) individuals, such as "Junior," had been calling Butch Trojano at the Cassidy residence to arrange cocaine transactions; (3) a person who identified himself as "Joe" called the Cassidy residence to inquire about purchasing "a half-ounce," agreed to meet at the Cassidy residence and said he would call back in ten minutes for directions; (4) ten minutes later an individual identifying himself as "Joe" called and (apparently believing that he was talking to Trojano) said that he was calling from Captain Nick's restaurant, took directions to the Cassidy residence, and arranged to buy half an ounce of cocaine for $1,100; and (5) approximately ten minutes later, about the time it would take to drive from Captain Nick's restaurant to the Cassidy residence, defendant arrived at the Cassidy residence, identified himself as "Joe" and stated, *inter alia*, that he had come from Captain Nick's restaurant. The foregoing facts provided ample evidence to warrant a "prudent and reasonable man" in believing that defendant was attempting to purchase cocaine. Thus there was probable cause for defendant's detention at the Cassidy residence.

Second, as in *Cupp*, the intrusion involved in the brief detention of defendant at the Cassidy residence was of a limited nature. Detective Hall testified that he was searching for evidence, not weapons, and thus defendant simply was asked to empty his pockets. Defendant was neither frisked nor thoroughly searched, as would be permissible incident to a formal arrest. *See Robinson*, 414 U.S. at 235, 94 S.Ct. at 476; *Chimel*, 395 U.S. at 763, 89 S.Ct. at 2040.

Third, and most significant, the scope of the search was limited to a search for evidence as impermanent as the fingernail scrapings at issue in *Cupp*. In addition to providing probable cause to arrest or seize defendant, the facts known to Detective Hall prior to any personal search of defendant, particularly the phone conversation preceding defendant's arrival at the residence, gave Hall probable cause to believe that the person who had just arrived to purchase cocaine would be carrying a large amount of cash. As other courts have noted, the ease with which cash may be dissipated or hidden justifies searching a defendant before allowing him to leave the scene of a detention. *See United States v. Hall*, 739 F.2d 96, 100 (2d Cir.1984); *United States v. Juarez*, 573 F.2d 267, 274–75 (5th Cir.1978). Moreover, where there is probable cause to arrest or seize an individual at the scene of a planned cocaine transaction, the circumstances in which any physical evidence is obtained are as probative as the physical evidence itself. Thus, in this case the evidence (that a person calling himself "Joe" arrives at the Cassidy residence with $1,159 in cash ten minutes after "Joe" calls the residence to arrange for the purchase of cocaine for $1,100) would either be obtained at the scene, or not at all. There were exigent circumstances justifying the search of defendant's pockets at the Cassidy residence.

■ As the Court noted in *Cupp*, "[t]he basis for [the search incident to arrest] exception is that when an arrest is made, it is reasonable for a police officer to expect the arrestee to use any weapons he may have and to attempt to destroy any incriminating evidence then in his possession."

412 U.S. at 295, 93 S.Ct. at 2003. Where there is a brief detention supported by probable cause and there is a risk that evidence would otherwise be lost or destroyed, the police may conduct a warrantless search of the person coextensive in scope with the reasonably perceived risk to the evidence.

One commentator has stated:

At a minimum, *Cupp* should be applied so as to permit, when there are grounds upon which a formal arrest could have been made, a more extensive search for any evidence reasonably believed to be in the possession of the suspect which might be unavailable later, either because of future conduct of the suspect or by other means.

2 W.R. LaFave, *Search and Seizure* § 5.4(b) at 341 (1978).

In this case, as in *Cupp*, the brief detention of defendant would alert him that he was the focus of police suspicions, thus engendering a strong motivation to do away with evidence of any criminal activity. Moreover, in the circumstances of this case, the probativeness of the evidence would be greatly diminished merely by virtue of defendant's departure from the residence.

Thus, the absence of a custodial arrest did not render the search of defendant unreasonable. As LaFave has noted,

If such exigent circumstances plus probable cause justifies (sic) search of a movable vehicle or containers in transit, then it (sic) should likewise permit search of a person. The mere fact that for some reason it was not also deemed essential to make an immediate formal arrest of the defendant is no reason for treating a search of the person differently, for (as *Cupp* itself makes clear) the exigencies relating to acquisition of evidence from the defendant's person and to obtaining the defendant's presence for future criminal proceedings against him are not inevitably identical.

*Id.* (footnote omitted).[6]

The court concludes that the search of defendant's person was constitutional. Although defendant was not formally arrested, the existence of probable cause to arrest defendant, coupled with the circumstance that certain evidence could be preserved only by means of an immediate search, justified the reasonably limited personal search incident to defendant's brief detention. Therefore, defendant's motion to suppress is *DENIED*.

SO ORDERED.

---

6. Professor LaFave suggests that searches incident to a noncustodial seizure might better be considered against the warrantless search test stated in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), i.e., the search is permissible if there are exigent circumstances and there is probable cause that evidence will be found in the search. 2 W.R. LaFave, *Search and Seizure* § 5.4(b) at 345. As noted in the text, in this case there was probable cause both to arrest defendant and to believe that evidence of a crime would be found on defendant's person. Thus the search was lawful both under *Cupp* and under the *Chambers* standard proposed by Professor LaFave.